Pendleton contra.
Before it can be - known whether the case which was argued on a former occasion is not the *203 game as that now before the court, they will advert to it.. If they will only take a short review of it, they will perceive that now agitated presents the very same subjedb as to the right to abandon, with some slight differences, and a trifling variation in the arguments and points. The special verdict of this day, only states the abandonment to be a little earlier, and in all other respects the testimony is totally alike. The defendant contends, that this is not such a case of total loss as will warrant an abandonment. For this he relies on the former decision of the court, in Le Roy, Bayard, and Me. Evers v. Governeur. The next question is, whether the plaintiffs are not entitled to recover the whole amount of the subjédt insured as for a total loss. Admitting that they have a right to recover for a general average, the inquiry will be, what is it to be made for l- general average is the contribution for that, which is • sacrificed for the preservation of all. If the loss be applicable only to one, it is a particular charge. It must have been for the general benefit, and have had the effedt of saving : for if by ejedting, goods be saved from one storm, and lost in another, they will not pay average, because they have not been saved.* The question is whether the whole value of the corn is to be brought into the general average. The fadts stated in evidence, as connedted with the special verdidt, do not warrant the conclusion that all the damage arose, as an inevitable consequence, from cutting away the mast. May not the injury be attributed to another cause ? did not a witness expressly testify from the confession of master, mate, and crew, it was only principally, and not exclusively owing to the cutting away, that the corn was injured ? He was examined, for no other purpose, than to prevent the conclusion of the jury as to the source of damage. On the former argument it was never contended, that the com was to be made a subjedt of general average. This was an after-thought; an ingenuity of counsel to add the value of the corn to the general average, because it could not be recovered in any other way. *204 Therefore, the injury is now made an immediate consequence of cutting away the mast, and then the rule of law, applies as to consequential loss, and, right to contribution* But the verdidt shews the storm had been making a,breach over the vessel long before the mast was sacrificed, and there is no evidence that the vessel did not then ship some water : it is impossible she should not. But if the injury had arisen from and in the manner stated, does it come up to the position of counsel ? According to this, every possible consequence of cutting away, is to be a matter of general average; and, if so, every thing, however consequential, will be a loss within the meaning of th e term. Should a captain, after a necessity to ejedt, be obi iged to remove part of his cargo, if he place it where it receives damage, there would be a loss,* and it must be considered as general average. But supposing the corn to be considered as general average^ it is doubtful how the calculation ought to be made. The whole value is now considered as lost. This surely is not corred!. Goods, even that are lost, are to contribute ; not all however in the present case were so, because there was to the amount of 900 dollars saved. This must be dedudted from the amount to be brought into average, and ought to be taken from the cost at the port of shipment. And though this was given for freight, yet it was no more than might be due, for the vessel was found to be able to proceed on her voyage, and surely the underwriter is not obliged to pay the amount of freight as a loss under" the policy. -
Hamilton on the, same side. It is objected that the testimony, which goes to controvert the conclusion of the jury as to the cause of damage, is only hearsay. It will be well worth while to consider by whom it was adduced. It was by a clefk of Le Roy & co. sent by them as an agent, who related what their other agent, the captain, had said 5 he himself did not testify. This therefore was the declaration of their own agent, produced by themselves, and certainly from them at leasts entitled to credit. He says, the damage wasprincipally owing to the cutting away the mast j the inference therefore is, it was not wholly. The two ideas are not convertible, the one into the other. They are con» *205 iradiflions in terms, the jury having no other data, from whence to infer, must certainly have given their verdidt against all evidence in the cause: it is impossible the jury could have drawn an inference, from any fadts there. Principally, it must be acknowledged, is a vague term, but it negatives the idea of wholly. It permitted the adoption of some loss from the cause alleged, but did not allow attributing the whole. In my opinion, a bare majority of the subjedt, a little more than half, could be intended under that view. How then would this operate ? It is incumbent on a plaintiff to render a subjedt precise. Where he cannot, it turns to his own disadvantage. There is no criterion of fadts. Principally is, in law, the greater part. There is no criterion for the jury to decide except the word principally, which leads to no conclusion except something more than half. It is of considerable importance in the investigation of causes, as it relates to truth.and justice, that too much latitude be not allowed to vague inferences. This often creates a disposition in the mind to draw conclusions from uncertain premises and is a reason why we should confine it to strict dedudtions, and adopt a rule for it to govern itself. Inasmuch as there is no datum to determine the fadt, of how much, beyond half, was injured, the law will intend just more than half, and nothing less. It will not be permitted in the face of evidence that it was not wholly, that it was a little more than half damaged, to say, that it was wholly and entirely so. When a person who knows how much, pronounces principally, shall a jury say wholly ? are there any fadts in the special verdidt from whence the jury can draw such an inference ? From the 21st of the month to the 26th, the vessel was in a course of storm Can this have produced no injury ? A duration of five days bad weather ? Though possible, it is not probable such should have been the case. Then comes the jettison, and then the witness says, he believes the principal part of the damage took place. But was there not something subsequent, from which the injury might be supposed to proceed. There was another storm from whence it is impossible the injury should not have been increased : it could *206 not have been repaired. If what took place the next day was the consequence of cutting away the mast, within their word principally, I must differ from the counsel associated with me, whether some of this injury be not a subr jefit of compensation. That which was immediate, is as I conceive, to be contributed for. 1 Mol. b. 2. c. 6. s. 7. not however to go further' than what dire fitly ensues. But as there was another tempest immediately supervening it is impossible to calculate the quantum of damage in one, and the quantum in the other, so as to ascertain the consequence which was immediate. In an interior view of this case thq jury appear to have lumped too much; to-have added together what might be attributed to precedent, and to subsequent causes; it is impossible to say the jury did not value the second tempest. The fafiks do not warrant their' conclusion, and therefore, they had no sufficient basis „to over-rule the captain’s own declaration, that the whole- injury was not from the jettison. He had every thing under his eye, and therefore must be the best judge whether all the damage arose from the first tempest. If the court think thus, the matter must be reviewed, they certainly will not say all when the party by his agent says the reverse. In every case like this, the master is agent for every one concerned. It is not a case of total loss, in which he is the agent of the underwriter : in average losses he is the .representative and deputy of each party insured. He has á duty to perform, and is responsible to them for its discharge. He is to collefit the proportion to be contributed; from each his contributory share. He is bound to malee this colléfitidn, and then distribute according to the general average : he is liable, if he parts with the cargo, before the contribution is settled. The result then necessary is, that the party having a claim on him, must have recourse to him for the average, and call on the underwriter for the ultimate loss. That is, the difference between the injury sustained, and the sum he is entitled to receive from the defendant in this suit. On the one hand the owner of tire cargo had to receive for the injury done to the corn, on the other the owner of the ship, for die injury done to that. It was a complicated fafit of mutual contribution. The owner of the goods was *207 obliged to discount, so muchof his demand against the owner of the ship, as the owner of the ship was entitled toreceivefrom him, and cannot ask the whole loss from us. Suppose he had a right to receive more for the corn lost, than he was bound to contribute for the injury done to the ship ? He cannot come against the underwriter for the whole of what would be due for the damage without this set-off. What he was to receive might be less than what he had to pay; can he have recourse to the underwriter for more than he did pay? On a total loss the underwriter is to pay a total loss; on a partial,a partial loss; and, when there is ageneral average, the quantum ascertained on a just calculation among all the parties. For the assured ought to recover only the amount of the loss occasioned by the jettison or other disaster, after deducing what he was entitled to receive, in contribution from the other parties concerned in the voyage. The underwriter ought not to pay, when the assured has a subject on which he has a right to claim. From the insurer he ought not to recover, when his agent has in his hands a pledge from whence it is to be taken. As to the arbitration, the defendant was no party to the submission, and therefore was not bound by it. The right to abandon must, or the principle of Le Roy and others v. Governeur, be denied. As the value of the com was not less than the freight, there could not for that reason also, be any ground for abandoning, especially as the vessel was repaired and the owners willing to proceed.
Harrison in reply. The former decision in a case acknowledged to be under this policy is greatly insisted on. Did this not essentially differ, the court would not now be addressed. When that was considered, the point now in contest, as to a total loss never arose. The question then raised was, whether an abandonment could be made under circumstances very different than those which now present themselves? Here tire aft was justified, from the local situation of the subject. There the ground'lvas that being-injured to more than half the value, the party was entitled to abandon. The court must recolleót that in Le Roy, v. Governeur, the plaintiffs could not give in evidence the time when the abandonment was made, they only being able *208 to do it, and as parties to the record, inadmissible. The time is not unimportant, as on it, may depend the right of the party to a total or an average loss. For instance, suppose a capture, and the assured, a day before he hears of the vessels’ safety, abandon? It will be good. If he delayed till after receipt of the information, it would be nugatory. The court will never say, that an abandonment made when the party had a right to abandon, shall be impeached by the memorandum. It is not contended that when the vessel was at New-Castle, she could have been repaired, or stores had, or that the cargo could have been conveyed to its place of destination. At that period then it clearly, was a total loss. Had the assured lain by, it would have been otherwise, but they did not; they took immediate advantage of their right, which did not rest on the memorandum, but on the right to abandon. Goss v. Withers.*
The principle now contended for is, that whatever the cargo may be, or its situation the right to abandon, turns the loss on the insurer, and this point is not the one decided by the court.
The former consideration was, whether a deterioration, to more than half the value, authorised an abandonment ? The consideration then turned on the distinction between the laws of England and France on that right. On this point both parties are agreed. But one question now is, whether this case ought to be sent back for examination to another jury? They were not to be bound by the relation of hearsay causes, said to have been acknowledged by the captain and others. They had faCts before them, and from them they were justified in attributing the damage to either one cause or the other. Are there not faCts in the case from whence a jury might say the loss arose from the jettison? There is nothing from whence they could infer it an-, tecedentto the cutting away the masts. Allowing all that has been said respecting the word principally; that it means exaCtly a little more than half, the jury have decided on the credit due to it, and they have not thought it enough to outweigh the evidence of the damage, arising solely from the jettison. They find the cutting away the mast neces *209 aary for the preservation of all, and the injury was an ifflmediate dircét consequence of that cutting away. This then is clearly a loss within the meaning of general average; and being of the whole, is a total loss. But here it is said we have no right to look in the first instance to the insurer; we must take from the captain and others, and then apply to the underwriter for the balance. Is it not however a loss from tire perils of the sea, from a general average arising out of those perils? And will the court turn us round from, the words of our policy to the captain, because it is said he has a lien on what was to pay us, and being our agent ought: to have thus applied it ? Can he justify holding the ship till the owner of goods ejected, be paid? If he has not this power over the vessel, neither can he detain the cargo. Suppose my goods thrown over board, the owner of the vessel a bankrupt. .The captain does not perform this duty, and she sold by his assignees on her arrival, can the underwriters say you must look to the owner, the casus foederis ' has not taken place ? All that can be done is to substitute the underwriter in our place, and he will have a right to U:.e our names in the prosecution. It is from him we have to expeó! fatisfaótion. The court will find the principles on which the contribution has been settled to be correó!; as our loss is of the whole, and as that is to be contributed for, we contend both on the right to abandon, and on the settled rule of law in cases of general average, that we are entitled to resort to our policy, and leave the assurer to reimburse himself from the others.
Per curiam. Delivered by Kent, justice. This cause comes before the court upon a special verdiSr, which states that Le Roy, Bayard and Me. Evers, on the 10th September 1798, effeóted an insurance on goods on board the Ann and Mary from New-York to Madeira; but it was agreed by a memorandum, to the policy that salt, grain, tf all kinds, Indian meal, fruits, dry fish, and all other articles, perishable in their own nature, should be free from average unless general. That on the same day, defendant signed the said policy for 1000 dollars. That the above assurance by Le Roy and others was made ■ n account of the plaintiffs, who had an interest in the cargo to the *210 amount of the sum insured. That the cargo shipped by Le Roy and others on account of the plaintiffs-consisted of 5414 bushels of Indian corn, the first cost of which was 2982 dollars and 98 cents ; 5000 pipe staves, the first cost of which was 170 dollars 31 cents ; 4000 hogshead staves, at 95 dollars 50 cents; 2500 quarter cask staves, at 31 dollars 72 cents, for the. freight whereof the master was to have 550 pounds sterling for the corn, .and 148 pounds for the staves. That on the 17th Sept. 1798, the vessel sailed on the voyage with the said cargo and was seaworthy. That on the 21st of Sept, she met with squalls of rain and heavy seas, and the weather continuing bad on the 26th and blowing violent, the wind suddenly chopped round and blew with such violence as to lay the vessel on her beam ends, and the mainmast, masts and- rigging were necessarily cut away, and after the vessel righted, there were four feet of water in her hold. That while the vessel was in this distress, and the crew were engaged in cutting away the mast, and nailing a coat over the stump, (which occupied about one hour and an half,) much water rushed into the hold and over tire decks. That on the 27th, it became necessary for the safety of the vessel to throw overboard one half of the staves. That the vessel was obliged to bear away for the nearest port, and she arrived at New-Castle in Delaware, on the 17th of October. That at New-Castle no stores could be obtained to land the cargo, or assistance procured to repair the vessel, and the yellow fever raging violently both at Wilmington and Philadelphia, she waited at New-Castle till it abated, -when on the SOthof OtSlober she went up to Philadelphia. That on information of the above losses, the said Le Roy and others, on the. 25th or 26th of Oñober, while the vessel was at New-Castle, abandoned to the defendant. That on discharging the Cargo at Philadelphia, the corn was found to be so much damaged as to be wholly unmerchantable, and unfit to be re-chipped; wherefore the voyage was given up, and that the whole of the damage thereto arose from cutting away the mast as aforesaid for the preservation of the vessel and cargo. That the cargo saved as aforesaid, was sold for the benefit of those interested and produced, *211 after- deducing charges 924 dollars, which sum was paid to the owners of the vessel for freight, pursuant to an award to which however the defendant was not a party. The vessel was repaired at Philadelphia, and ready to receive her cargo on the 28th of November.
The questions arising upon this verdi it are, whether the plaintiff ought to recover for a total loss, or for a general average, or a particular average ? And if the plaintiff is entitled to recover as for a total loss, the jury assess their damages to 1231 dollars 54 cents. If for a general average, for the loss sustained by the injury done to the corn, then to 909 dollars 69 cents. If neither, then to 237 dollars 51 cents. And the parties agree, that, if in estimating the geneeral average, the freight of tire cargo to Madeira, ought to be estimated, and not the freight actually paid at Philadelphia only, then the ' sum is to be altered accordingly: and they also agree that if the plaintiff was not bound to look to the owner of the vessel for the proportion to be borne by the vessel and freight, then the loss is to be considered as total, if plaintiff be entitled to recover a general average.
The only evidence on the question is, whether the damage the corn sustained was wholly or in part only owing to the cutting away of the mast. Besides the fails found in the verdiil,. there was the deposition of a witness who declared that he was informed at Philadelphia, by the captain, mate :;nd crew, that the damage the corn sustained was principally in consequence of cutting away the main-mast, and another point was submitted, whether the verdidt was not in this respect, against evidence. This deposition was admitted by consent as competent evidence.
Two questions have been made upon the fadts stated in this case.
1. Whether the plaintiffs be not entitled to recover as for a total loss ?
2. If not, tiren by what rule is a general average to be liquidated.
The first point was settled by this court, in the case of Le Roy, Bayard, & Mc. Evers v. Goveneur. That case arose upon this same policy, and upon fadts substantially the same. The question was on the construótion of the *212 words in the memorandum, free from average unless general; and the court decided, that to make the insurer liable there | must be an aétual destruction of the article specified in the | memorandum, and not merely such a technical loss of the ' article as would authorize an abandonment. Consequently 1 as tire corn existed in that instance, the insurer was not lij able for it, however deteriorated it might have been by the i! perils of .the sea.
This decision was warranted and governed by the case of Cochin v. Fraser, which was a strong and unanimous determination of the court of King’s Bench, upon a case reserved on the very point in question. In that case the insurance was upon a cargo of fish from Newfoundland, to a port of discharge in Portugal, and which was Figara. On the passage the crew hove overboard part of the fish, for the general preservation of the ship and cargo, and the ship was obliged to put into Lisbon, which was upwards, of one hundred miles from her port of discharge. It was there found upon survey that the fish were rendered of no value, through sea damage, and the ship did not proceed on her voyage. The court held the insurer liable for no more than what he had paid into court as a general average on the cargo, and a particular average on the ship. Lord Mansfield observed “ that the insurer was liable only for a totallobS, and that the total loss here was the loss of the thing itself, and not anydamage however great while it exists. That in common cases 'when the voyage is obstruEled and not 'worth pursuing, it is a total loss. But the memorandum goes on the idea that the insurer is not to be liable for any damage however great.” Buller J. observed also “ that the voyage being defeated, might be very material in cases not within the memorandum.” This decision therefore goes the whole ; length of settling that, although in certain cases a total loss i mayjhShiVhatever defeats the voyage, and will authorize an | abandonment, this will not hold in the case of perishable t articles within the memorandum. The insurer there is se~ ¡cure against all damage to them, whether great1 or small j whether it defeats the voyage, or only diminishes the price .of the goods. The memorandum prevents the loss from be *213 ing total unless, the article be burnt, sunk, captured, or otherwise completely destroyed; and considering the difficulty of ascertaining how much of tire loss arose by the perils of the sea, and how much by the perishable nature of the commodity, and the impositions to which insurers would be li- ' able in consequence of that difficulty, the rule of construe-; tion, as now settled, is the most salutary, by reason of its simplicity and certainty. This difficulty would remain in full force, if the law was otherwise, and the insurer was to be held for damage to the perishable articles, when that damage was so great as to occasion a loss of the voyage. One great objeót of the rule would, in such case, be defeated.
I have been the more particular in explaining the former decision, and giving it my full acquiescence, from an impression which I received at the argument of this cause, that the decision was not sufficiently understood, or that it did not give all desirable satisfaction. The observation of Lord Kenyon, in die cause of M'Andrews v. Vaughan would seem also, as it stands at present without explanation, to be opposed to the rule we have adopted; for, he said the insurer was liable not only when the article was actually destroyed, but when the voyage was lost. If by this observation was meant that the insurer was held when the voyage was lost, by some cause or peril not arising from the condition of the articles in the memorandum, it is not contrary to the rule contended for; but if it is to be understood as extending to a loss of voyage, in consequence of damage, however great, to the articles in the memorandum, it is direftly contrary to the decision of Cocking v. Fraser, and cannot be received as law.
It is to be observed that it is not stated in the verdict that no other vessel could be had at New-Castle, to carry the cargo, but that the vessel in question could not there be repaired; and it is found that she was speedily repaired at Philadelphia, and was ready for the voyage, but that it was given up and deemed lost in consequence of the unmerchantable condition of the cargo, and because no other cargo of the like kind (it being Jersey flint corn) could be there obtained. This was evidently the real cause of the loss *214 / t^ie voyage, and therefore, neither this, nor the former | decision, apply to the case of a loss of voyage from injuries I distinS from those happening to the perishable articles, such, for ^nStance’ 38 an irreParable damage to the ve:sel. That would be a loss of voyage in a case not -within the memoranJ dum, and liable to be regulated by other rules.
As the plaintiff is not entitled to recover as for a total loss, the next point that arises for consideration is, whether' the plaintiff be not entitled to recover a general average, as fixed hy the ver.didl.
A question here preliminarily arises, and that is, whether the verdiit be contrary to evidence in stating, that “ the -whole of the damage sustained by the corn, -was occasioned, by, or in consequence of the cutting a-way the mast of the vessel, for the general preservation
To support this finding, the evidence was; that in cutting away the mast, it splintered off at and below the partners, and tore away a piece of cloth which was nailed to the deck and mast; and, by means of the splintering, and the removal of the cloth, vast quantities of water continued to rush into the hold of the vessel, until the stump of the mast was cut off and a new coat nailed over the same, which occupied about an hour and a half; during all which time, and for several hours afterwards, the water made a free passage over the decks, and one pump was continually going, the other having been carried away, and become totally disabled by the fall of the mast. In addition to these.' fails, there is the deposition of a witness, who heard the captain, mate, and crew say, that the damage the corn sustained, was principally in consequence of cutting away the mainmast, &c.
Upon these fails, I am not dissatisfied with the conclusion drawn by the jury. No other cause of direit injury to'the corn is found. The one stated must have essentially injured the corn. The injury was inevitable, and the cause was sufficient to have produced the -whole effeEl. I think ■ the conclusion a reasonable one. • We - are, therefore, to consider the mast as sacrificed for the general safety of the ship and cargo, and that in the act cf sacrificing the mast *215 er, as A necessary consequence of it, the com was damaged, and this damage must be included in a general contribution. The corn being damaged by the cutting away of the mast, is to be considered equally with the mast, a sacrifice for the common benefit; a piece of safety to the rest: and it is founded on the clearest equity, that all the property and interest saved, ¿night to contribute their due proportion to this sacrifice. The plaintiff is therefore entitled to recover as for a general average, for the loss sustained by the injury done to the corn, and two remaining questions are next to be settled.
The one is, whether, in the adjustment of average, the freight of the cargo to Madeira ought to have been estimated, and not the freight only paid at Philadelphia. In this case, I think the adjustment, as settled by the award, ought to stand"; for that the freight actually gained or earned in the voyage, and not what the vessel would have earned if she had gone to Madeira, ought to be the rule of contribution.
The other question is, whether the totality of the contribution due to the plaintiffs, for the loss of his corn, is recoverable in the first instance from the insurer.
I am of opinion that it is, because the loss arises wholly from a peril within the policy, and the plaintiff has a right to look for his indemnity from the person who has engaged to indemnify him from the peril. This argument appears to me to be conclusive. This will not lead to a multiplicity of suits, any more than a different rule, for if the plaintiff could recover only a contributory share from the defendant, he would be compelled to resort to the owner of the ship for the residue; and this suit over, may as well be brought by the insurer as the plaintiff, for one great objeft of insurance is, promptly to re-invest the assured with his capital, lost by the perils of the sea, and thereby enable him to continue his commercial enterprises.
In addition to this, it appears to be the English praitice for the insurer to pay, in the first instance, the adjusted ave-
*216 I am accordingly of opinion, that the plaintiff is entitled to recover a general average. That in adjusting this average, the freight has been properly estimated, and that the plaintiff is not bound to look to the owner of the vessel for the proportion to be borne by the vessel and freight, and these points being established, the loss is to he considered as total, according to an agreement of the parties at the foot of the case.
Lewis, chief justice observed, he had delivered the opinion of the court in the case of Le Roy, Bayard and M‘Evers, against Governeur, on the same policy, and that as far as the present decision turned on the import of the exception, free from average unless general, when applied to the corn, he fully assented to it. That the other questions arose upon an argument between the counsel, subjoined in a note at the foot of the case, which had been omitted in copying the case delivered to him. He therefore had not considered them. He saw no objection, however, in concurring with/the adjustment as to the quantum of freight to be charged with contribution to the general average: nor with/thejprinciple that the underwriters, and not the owners and shippers, were to respond, in the first instance, to the assured for the general average receivable on the corn, if entitled to any .within the terms of the contradi of indemnity.^ But that he had great doubts on the other point, viz. Whether the injury received by the corn from the jettison j of the mast, and the consequent irruption of the sea water, could entitle it to a general average as between insurer and / insured. He was strongly inclined to think it within the spirit and meaning of the terms of the exception: the obje£t and design of which is, to avoid and shut out, between the parties to the policy, every question on the cause of injury to the corn, where it might equally arise from the perishable nature of the commodity, as from external causes. This was a case of that description, and actually involved the question, the assured intended to steer clear of. For that the evidence is, that the injury sustained by the corn was principally owing to the sea water getting in thro’ the partners, before the coat - could be replaced. That it appeared to him rather an ingenious Contrivance on the part *217 qf the assured to obtain under the form of a general, what he could not under that of a particular average. He, however, gave no opinion.
Livingston, justice, having been concerned in the cause, gave no opinion.

 If the goods be faved from the fecond peril, they (hall contribute for an ejecting, which has faved from a firft danger, Tho’ the (hip be loft in the fesond. See 1 Lex Mcr. Amer. 230. and the authorities there.

 Though eonfcquential, it would not be immediately ib,

 2 Burr, 694.